UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

                              Plaintiff,


                -against-                                S1 03 Crim. 0308 (LAK)


ARNOLD MAURICE BENGIS, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────────────┐
│ USDS SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED: 6/14/13                  │
└─────────────────────────────────────┘
```


### MEMORANDUM OPINION


Appearances:

Daniel W. Levy                          Mark A. Berube
Assistant United States Attorney        MISHCON DE REYA NEW YORK LLP
PREET BHARARA
UNITED STATES ATTORNEY                  *Attorneys for Defendants Arnold Bengis, Jeffrey*
                                        *Noll & David Bengis*

2

LEWIS A. KAPLAN, *District Judge.*

Defendants Arnold Bengis and Jeffrey Noll pleaded guilty to: (i) conspiracy to violate the Lacey Act[1] and to commit smuggling, and (ii) substantive violations of the Lacey Act. Defendant David Bengis pleaded guilty to the conspiracy charge only.  In 2004, the defendants were sentenced to various terms of imprisonment and supervised release and together forfeited a total of $13,300,000 to the United States.   This matter now is before the Court on the report and recommendation of Magistrate Judge Andrew J. Peck (the "R&R"),[2] which recommended that the defendants be ordered to pay restitution, jointly and severally, to the Republic of South Africa in the amount of $54,883,550.  Defendants object to the R&R.

*Background*

The background of this dispute was recounted by the Court of Appeals as follows:

"From 1987 to 2001, Arnold Bengis, Jeffrey Noll and David Bengis (jointly, 'defendants') engaged in an elaborate scheme to illegally harvest large quantities of South Coast and West Coast rock lobsters in South African waters for export to the United States in violation of both South African and U.S. law. Arnold Bengis was the Managing Director and Chairman of Hout Bay Fishing Industries, Ltd. ('Hout Bay'), a fishing and fish-processing operation in Capetown, South Africa, through which defendants principally organized their conspiracy to capture, process and export lobster to the United States. Jeffrey Noll and David Bengis were presidents of two U.S. corporations that imported, processed, packed, and distributed the fish within the United States on behalf of Hout Bay. At all relevant times, the harvesting,

---

[1]    The Lacey Act provides in pertinent part: "It is unlawful for any person . . . (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. § 3372(a)(2)(A). The term "fish or wildlife" is defined to include crustaceans, such as lobsters. 16 U.S.C. § 3371(a).

[2]    DI 206.

processing and exporting of South Coast and West Coast rock lobsters from South Africa was governed under South African law principally by the Marine Living Resources Act 18 of 1998 ('MLRA'), the regulations promulgated under the MLRA, and the Convention on the Conservation of Marine Living Resources. The South African Department of Marine and Coastal Management regulated the harvesting, processing and exporting of fish from South Africa's waters by, *inter alia*, establishing fishing season quotas and issuing harvesting and exporting permits. Defendants caused Hout Bay to harvest South Coast and West Coast rock lobsters in amounts exceeding authorized quotas and to export those lobsters to the United States.

"In May 2001, South African authorities seized and opened a container of unlawfully harvested fish and alerted U.S. authorities that another container was scheduled to arrive in the United States soon thereafter. Following the May 2001 seizure, the defendants continued to attempt to avoid detection and to perpetuate their scheme.

"Although South African authorities obtained arrest warrants for defendants, after concluding that defendants' financial resources and presence outside of South Africa rendered them 'beyond the reach of South African authorities,' South Africa declined to charge, much less prosecute, them. Instead, South Africa focused its prosecution on the 'South African-based entities involved in the scheme,' including Hout Bay, its operational manager, Collin van Schalkwyk, several West Coast lobster fisherman with whom Hout Bay had contracted, and fourteen fisheries inspectors who had taken bribes during the course of the scheme. In April 2002, Arnold Bengis returned to South Africa to enter a plea of guilty on behalf of Hout Bay for, *inter alia*, over-fishing of South and West Coast rock lobster in violation of the MLRA. According to its plea agreement with the South African government, Hout Bay paid a fine of 12 million Rand (approximately $1.2 million in April 2002) and forfeited two fishing boats and the contents of the container seized by the government. The South African government also cooperated with the United States in its investigation and prosecution of the Bengises and Noll for their violation of U.S. law.

"Following their indictments in the United States, Arnold Bengis and Jeffrey Noll pleaded guilty to: (i) conspiracy to violate the Lacey Act and to commit smuggling in violation of 18 U.S.C. § 371; and (ii) violations of the Lacey Act, 16 U.S.C. § 3372(a)(2)(A). David Bengis pleaded guilty to the conspiracy charge only. In 2004, the defendants were sentenced to various terms of imprisonment and supervised release and together forfeited a total of $13,300,000 to the United States. Although the defendants' plea agreements acknowledged that restitution might be ordered, with the parties' consent, the district court deferred the restitution hearing to a later date.

4

"Following the court's decision to hold a restitution hearing, the United States submitted a report prepared by the Ocean and Land Resource Assessment Consultants ('OLRAC'), a group of experts commissioned by the South African Department of Marine and Coastal Management, setting out two different methods for calculating restitution. OLRAC Method I focused on the cost of remediation, i.e., what it would cost South Africa to restore the rock lobster fishery to the level it would have been had the defendants not engaged in overharvesting (the 'catch forfeit' amount). OLRAC estimated restitution using the catch forfeit amount to be $46,775,150. OLRAC Method II focused on the market value of the overharvested fish and was calculated by multiplying the quantity of overharvested fish by the prevailing market price. OLRAC estimated restitution using OLRAC Method II to be $61,932,630.

"The government recommended that the district court adopt OLRAC Method I restitution amount—the lower of the two calculations—which totaled $39,700,000 after deducting the value of the fine and vessels previously forfeited by Hout's Bay to South Africa. Alternatively, the government recommended adopting the OLRAC Method II calculation totaling $54,900,000 after those same deductions."[3]

This Court then ruled that South Africa was not entitled to restitution under either the Mandatory Victim Restitution Act ("MVRA") or the discretionary Victim and Witness Protection Act ("VWPA").[4]   Moreover, it ruled that even if restitution were available under the VWPA, "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section would outweigh the need to provide restitution" in this case.[5]

---

[3]

United States v. Bengis, 631 F.3d 33, 35–37 (2d Cir. 2011) (internal citations omitted).

[4]

See United States v. Bengis, 03 Cr. 0308 (LAK), 2007 WL 241370, *1 (S.D.N.Y. Jan. 29, 2007); United States v. Bengis, 03 Cr. 308, 2007 WL 2669315, at *1–2 (S.D.N.Y. Sept. 12, 2007).

[5]

Bengis, 2007 WL 2669315 at *2.

5

On appeal, the Court of Appeals held that South Africa had a property interest in the illegally-harvested rock lobster and so had suffered the type of harm for which the MVRA requires restitution:

> "[L]obsters possessed in violation of the [South African] regulatory scheme do not become property of the possessors, rather they are subject to seizure and sale by the government of South Africa. Under this logic, the moment a fisherman pulls an illegally harvested lobster out of the sea, a property right to seize that lobster is vested in the government of South Africa. Evading seizure of overharvested lobsters thus deprives South Africa of an opportunity to sell those illegally captured lobsters at market price and retain the proceeds, representing an economic loss to South Africa each time an illegally harvested lobster goes unseized."[6]

It then held that South Africa, and not just the United States, was a "victim" of defendants' conduct and entitled to restitution under the MVRA:

> "By smuggling the lobsters out of South Africa knowing that they had been harvested unlawfully, defendants deprived the South African government of its right to seize and sell the poached lobsters. The defendants' conduct facilitated the illegal harvesting of the lobsters by providing access to the United States market and enabled the poaching to go undetected by the South African government by, for example, off-loading the over-harvested lobster at night, under-reporting catch amounts to South African authorities, bribing officials, and submitting false export documents. In doing so, the defendants' criminal conduct 'directly harmed' the South African government, which makes South Africa eligible for restitution under the . . . MVRA."[7]

The Circuit then vacated and remanded with instructions that this Court "calculate restitution and enter an order of restitution in favor of the Republic of South Africa,"[8] noting:

> "OLRAC Method II seems to us a sufficient loss calculation methodology under the circumstances presented by this case. This method most directly traces the nature of the loss inflicted on South Africa because, had the poaching been detected, South

---

[6]   *Bengis,* 631 F.3d at 39.

[7]   *Id.* at 41.

[8]   *Id.* at 42.

Africa would have been entitled to seize the illegally harvested lobsters at that time and sell them at market price for its own benefit. Restitution would thus be calculated by multiplying the number of poached lobsters by the corresponding market price (based on the prevailing market rates at the time the lobsters were poached). Every overharvested lobster that South Africa did not seize and sell represents a loss that has not been recovered."[9]

On remand, this Court referred the calculation of restitution to Magistrate Judge Peck for a report and recommendation. Those proceedings quite naturally focused on the OLRAC Report. Using Method II, OLRAC had calculated the loss to South Africa from the over-harvesting of West Coast rock lobsters to have been $29,495,800 and the loss from the over-harvesting of South Coast rock lobsters to have been $32,436,000.[10] Neither of OLRAC Methods I and II, however, attempted to calculate the value of illegally-harvested lobsters exported or intended for export to the United States. Its calculations estimated the total amount of illegally-harvested lobster.

The proceedings focused also on the evidence the government submitted regarding the quantity of lobster that the defendants imported into the United States. That evidence included the declaration of Special Agent Jeffrey Ray,[11] who said that he had conducted an investigation into the defendants' fishing business[12] in the course of which he interviewed two confidential witnesses who had been senior employees in Hout Bay.[13] They were required to be truthful with Special

---

[9]       *Id.* at 41.

[10]      OLRAC (Levy Decl. Ex. 2-A) Report at 30.

[11]      Levy Declaration ("Levy Decl.") Ex. 2-C, DI 195-15.

[12]      *Id.* at ¶¶ 2–3.

[13]      *Id.*

Agent Ray as part of their cooperation with a South African investigation.[14]  They explained that Hout Bay had harvested both West Coast and South Coast rock lobsters.[15]  Both stated that all of the over-harvested West Coast rock lobster were shipped to the United States.[16]  As far as the record discloses, however, neither witness spoke about the South Coast rock lobster.  There was no evidence as to whether it was sent to the United States or disposed of in South Africa or elsewhere.  Instead, the only mention of that point was the government's reference to a paragraph in the indictment that alleged that "almost all" of the over-harvested South Coast rock lobster also were imported into the United States.[17]  But it did not identify any evidence that supported that allegation.

The defendants argued to the magistrate judge that the amount of restitution due was that which flowed from the conspiracy to violate and the substantive violations of the Lacey Act.[18]  In other words, "[l]obsters not shipped to the United States, but to other markets, cannot by definition, be subject to Lacey Act violations."[19]  In still other words, they argued in substance that the United States may impose restitution only with respect to injuries flowing from violations of U.S. law.  They argued further that the government's evidence of the amount of lobster shipped to

---

14

*Id.*

15

*Id.* at ¶4(a)–(b).

16

*Id.* at ¶¶ 4(e), 5(f).

17

DI 201 at 17 (relying on Indictment S1 03 Crim. 308 (LAK) ("Indictment") ¶¶ 24).

18

DI 200 at 8.

19

*Id.*

the United States was not credible and that the government had failed to prove that any specific amount of lobster had been imported into the United States.

The government rejoined that it was proper to order restitution for over-harvested lobster that was not shipped to the United States and, in any event, that the government had demonstrated that all of the overharvested lobster had been imported into the United States.[20]

The magistrate judge agreed with the government that it was proper to order restitution for all of the illegally-harvested lobster on the ground that "[c]ourts have 'authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts.'"[21] Acknowledging that the defendants could not be "required to pay restitution for losses caused by acquitted or uncharged conduct that extends beyond the 'scheme, conspiracy, or pattern of criminal activity' included as an element of the offense of conviction,"[22] the magistrate judge nevertheless concluded that harvesting rock lobster in violation of South African law, whatever its ultimate destination, was criminal conduct in the course of the conspiracy to violate and the substantive violations of the Lacey Act to which the defendants pled guilty.[23]

In reaching this conclusion, the magistrate judge interpreted the Court of Appeals as having ruled that the defendants could be required to make restitution for all of the illegally-harvested lobster when that court wrote that "[b]y smuggling the lobsters out of South Africa

---

[20]

DI 201 at 14–15.

[21]

R&R at 9 (quoting *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000)).

[22]

*Id.* (quoting *United States v. Lisa*, 152 F. App'x 85, 87 (2d Cir. 2005) and 18 U.S.C. § 3663A(a)(2)).

[23]

*Id.* at 10–11.

knowing that they had been harvested unlawfully, defendants deprived the South African government of its right to seize and sell the poached lobsters."[24]  The magistrate judge did not reach the question of whether the government had offered evidence sufficient to show that all of the over-harvested lobster had been imported into or intended for the United States.  He did note, however, that defendants' criticisms of the government's evidence were not persuasive and that the government needed to prove the amount of loss only by a preponderance of the evidence.[25]

Adopting OLRAC Method II, which estimated the loss to South Africa to be $61,932,630,[26] the magistrate judge subtracted the $7,049,080 that defendants already had paid to South Africa and recommended ordering restitution in the amount of $54,883,550.[27]

*Discussion*

The Court of Appeals held that South Africa was a victim of the defendants' crimes and is entitled to restitution under the MVRA.[28]  The extent of that restitution, however, is hotly disputed here.

The fundamental issue arises in consequence of the facts that (1) OLRAC II calculated the losses to South Africa from overharvesting West Coast and South Coast rock lobsters

---

[24]
    *Id.* at 11 (quoting *Bengis*, 631 F.3d at 41).

[25]
    R&R at 8.

[26]
    OLRAC Report at 30.

[27]
    R&R at 12, 19.

[28]
    *Bengis*, 631 F.3d at 40–41.

at $29,495,800 and $32,436,800, respectively, and (2) while there is persuasive evidence that the West Coast rock lobsters all were imported into the United States, the government has identified no evidence, let alone evidence persuasive to this Court, that any of the South Coast rock lobsters were imported into or intended for the United States.  The question before the Court therefore is whether South Africa is entitled to restitution for the overfishing of South Coast rock lobster notwithstanding the lack of evidence that it came to or was intended to come to this country.

The MVRA provides in relevant part that restitution shall be ordered for harm resulting "from the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, . . . [harm directly and proximately resulting from] the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."[29]  The government bears the burden of proving the proper amount of restitution by a preponderance of the evidence.[30]

The defendants argue that the Court may order restitution to South Africa only for the harm caused by importing over-harvested lobster into the United States in violation of U.S. law. The magistrate judge summarily rejected that argument, essentially on the ground that courts may order restitution even on uncharged or acquitted counts.[31]  That of course is so, but it does not really answer the defendants' point.

The crimes of which these defendants were convicted were the conspiracy to violate the Lacey Act and to commit smuggling and, in the cases of two defendants, substantive Lacey Act

---

[29]    18 U.S.C. § 3663A(a)(2).

[30]    18 U.S.C. § 3664(e).

[31]    R&R at 8–9.

violations.  The gravamen of those offenses was the illegal importation, actual or intended, into this country of lobster caught in violation of South African law.  So there is no serious dispute that South Africa is entitled to restitution of the value of the West Coast lobster that was shipped to the United States.  But the R&R would go beyond that.  It recommends compensation to South Africa for the harm caused not by importation or intended importation into the U.S., but also by the taking of lobster in violation of South African law that was not shown to have come into or been destined for the United States.  Put another way, the R&R recommends restitution to a foreign country for violations of its own laws, but does not identify any U.S. statute that prohibited certain of the conduct for which restitution is proposed.  However reprehensible that conduct was, it did not transgress the laws of this country.[32]

       The magistrate judge's suggestion that the Second Circuit already has determined that the proper measure of restitution is the value of all lobster taken in violation of South African law, regardless of whether it was shipped or intended for shipment to the United States is not persuasive.  The principal issues before the Second Circuit were (1) whether South Africa was a "victim" that suffered pecuniary loss and thus entitled to restitution under the MVRA, and (2) whether the record supported this Court's conclusion that "the complexity of fashioning an award of restitution would further complicate and prolong the sentence so that the burden on the sentencing process outweighs

---

[32]    At the time the defendants pled guilty, they were U.S. citizens.  The record does not disclose whether they were U.S. citizens at all times during the existence of the conspiracy or if they only became U.S. citizens at some point during or after the conspiracy.  To the extent that they were U.S. citizens during the conspiracy, the U.S. technically would have had authority to regulate their conduct abroad.  The government has not, however, identified any U.S. law that the defendants violated in overharvesting South African lobster not intended for shipment to the U.S.  On the other hand, to the extent that the defendants at any point were not U.S. citizens and overharvested South African lobster while in South Africa without the intent to ship it to this country, the U.S. would have had no prescriptive jurisdiction.  *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402–403 (1987).

12

any need to provide restitution to which South Africa is entitled."[33]  The question whether South

Africa was entitled to restitution for lobster taken in violation of its laws that was neither shipped

nor intended for shipment to the United States was not before it.  And while the Circuit observed

that "OLRAC Method II seems to us a sufficient loss calculation methodology under the

circumstances presented by this case,"[34] that point was made only to indicate the basis for its view

that fashioning a restitution award would not be so complicated as to warrant denial of all restitution

whatever.  Indeed, if the Court of Appeals had meant to adopt the OLRAC II calculation without

further question and to foreclose any further consideration by this Court of the amount of restitution,

it would have entered an award itself.  Instead, it remanded "with instructions [that this Court] . .

. calculate restitution."[35]  If the Circuit's decision properly were read as the magistrate judge read

it, there would be nothing to calculate.

        Restitution for over-harvested lobster that was not shipped to or intended for the

United States cannot be squared with the MVRA.  The MVRA provides for restitution only for harm

"directly and proximately" resulting, "in the case of an offense that involves as an element a scheme,

conspiracy, or pattern of criminal activity," from "the defendant's criminal conduct in the course

of *the* scheme, conspiracy, or pattern."[36]  These defendants all were convicted of conspiracy in

violation of 18 U.S.C. § 371, which in relevant makes it unlawful to "conspire . . . to commit any

---

[33]     *Bengis*, 631 F.3d at 41.

[34]     *Id.*

[35]     *Id.* at 42.

[36]     18 U.S.C. § 3663A(a)(2) (emphasis added).

offense against the United States."  The indictment to which these defendants pled guilty asserted, to be sure, that the defendants engaged in a "scheme to illegally harvest  South Coast rock lobster, West Coast rock lobster and Patagonian toothfish."[37]  But that scheme, as the indictment effectively recognized, was not illegal under United States law.  So the charging portion of the indictment necessarily alleged a conspiracy to (1)  violate the Lacey Act *by importing into the United States* fish taken in violation of foreign law, and (2) illegally *import merchandise into the United States.*[38]  Thus, *the* conspiracy charge to which all three defendants pled "involve[d] as an element a . . . conspiracy" to import.  The allegations of these objectives – i.e., of an intent to bring the fish into the United States – were essential.  Without them, the indictment would not have charged an offense.  It therefore follows that the harm for which South Africa is entitled to restitution is that proximately caused by the defendants' "criminal conduct in the course of th[at] . . . conspiracy."

Accordingly, South Africa is entitled to restitution for lobster imported into the United States in furtherance of that conspiracy.  It is entitled also, assuming proper proof, to restitution for lobster taken in violation of its laws for the purpose of importation into the United States regardless of whether it ultimately was imported into this country.  But this Court sees no legal basis for awarding restitution to South Africa for lobster taken in violation of South Africa law that neither was shipped to the United States nor taken for the purpose of its shipment to this country.  Lobster taken in violation of South African law without any intention to send it to the United States doubtless caused similar harm to South Africa, but our restitution statute does not

---

[37]

Indictment ¶ 13

[38]

*Id.* ¶¶ 29-30 (emphasis added).

14

permit, let alone require, restitution for conduct that does not offend our laws, however illegal it may have been under the laws of South Africa.

      The magistrate judge interpreted the Court of Appeals as having held that it was the harvesting of lobster in violation of South African law, not solely its illegal importation into the United States, that was the criminal conduct that caused harm for which defendants' should be held liable to make restitution.  This Court does not interpret the Court of Appeals's language to mean that defendants may be held liable to make restitution for all lobster harvested in violation of South African law.  Rather, its point, as this Court understands it, was simply that South Africa, and not just the United States, was harmed by the defendants' illegal importation of lobster into the United States.

      Nor is the Court otherwise persuaded that any unlawful taking of lobster that were not at least intended for the U.S. market properly may be regarded as "criminal conduct in the course of the scheme, conspiracy, or pattern"[39] within the meaning of the MVRA.

      The Court has considered the defendants' remaining arguments and finds them to be without merit.

---

[39]   18 U.S.C. § 3663A(a)(2).

15

*Conclusion*[40]

For the foregoing reasons, the Court concludes that restitution is proper for the $29,495,800 in losses caused by defendants' importation of West Coast lobster into the United States in violation of U.S. law. The government has not identified any evidence that any of the South Coast lobster were imported into this country. The amount of restitution should be reduced by the $7,049,080 the defendants already have paid to South Africa. The government's application [DI 194] is granted to the extent that Arnold Bengis, Jeffrey Noll, and David Bengis shall pay restitution to the Republic of South Africa, jointly and severally, in the amount of $22,446,720. It is denied in all other respects.

SO ORDERED.

Dated:          June 14, 2013

_____
Lewis A. Kaplan
United States District Judge

---

[40] On June 3, 2013, the court received an email from defendant David Bengis attaching a memorandum of law, which this Court refused to accept. Nevertheless, the Court has reviewed Mr. Bengis's memorandum of law and it is without merit. *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), upon which he relied, does not require that any factual determinations critical to the amount of a restitution order be admitted by the defendant or submitted to a jury and proved beyond a reasonable doubt. *E.g.*, *United States v. Wolfe*, 701 F.3d 1206, 1216–17 (7th Cir. 2012); *see United States v. Pfaff*, 619 F.3d 172, 175 (2d Cir. 2010) (holding that criminal fines implicate *Apprendi v. New Jersey*, 530 U.S. 466 (2000) while restitution does not).